UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANIEL O. CONAHAN, JR.,

      Petitioner,

v.                  Case No:  2:13-cv-428-JES-KCD

SECRETARY, DEPARTMENT OF
CORRECTIONS and FLORIDA
ATTORNEY GENERAL,

      Respondents.

_____

## OPINION AND ORDER

    Before the Court are Daniel O. Conahan's Amended Petition for Writ of Habeas Corpus (Doc. #26), supporting memorandum (Doc. #27), and two supplements (Docs. #56 and #62), the Secretary's responses (Docs. #29 and #65), and Conahan's replies (Docs. #38 and #68). For the reasons set forth below, the Amended Petition is denied.

## I.  Background

    Conahan was convicted of the kidnapping and murder of Richard Alan Montgomery and sentenced to death.  The Supreme Court of Florida summarized the factual and procedural background in its opinion affirming the conviction and sentence:

> On April 16, 1996, Richard Montgomery, who lived with his sister, was with Bobby Whitaker, Gary Mason, and other friends when he mentioned that he was going out to make a few hundred dollars and would be back shortly. When asked whether it was legal, he smiled. Montgomery also told his mother that someone had offered to pay him $200 to pose for nude pictures, but he did not tell her who made the offer. In the same conversation, Montgomery

mentioned that he had recently met the defendant Daniel
O. Conahan, Jr., who lived in Punta Gorda Isles and was
a nurse at a medical center. The last time friends saw
Montgomery alive was on April 16 between 4 p.m. and 7
p.m.

The next day, April 17, Thomas Reese and Michael Tish,
who were storm utility engineers for Charlotte County,
discovered a human skull in a remote, heavily wooded
area off of Highway 41 and immediately notified the
police department. While searching the scene, deputies
found the nude body of a young, white male that was later
identified as Richard Montgomery. He had visible signs
of trauma to the neck, waist, and wrists, and the
genitalia had been removed. The forensic lab personnel
arrived and collected various items from the scene,
including a rope found on the top of a nearby trash pile,
carpet padding that covered the victim's body, a skull
and a torso (neither of which belonged to the victim),
a gray coat, and various combings from the victim's arms,
hands, chest, pubic area, and thighs. On the following
day, Deputy Todd Terrell arrived on the scene with a K-
9 dog which showed significant interest in a sabal palm
tree, specifically the side of the tree which was
somewhat flattened and damaged.

An autopsy revealed that Montgomery died as a result of
strangulation. He had two ligature marks on the front of
his neck, two horizontal marks on the right side of his
chest, and abraded grooves around his wrists. All of the
grooves were of similar width, did not extend to
Montgomery's back, and were consistent with marks that
would be left on an individual who had been tied to a
tree.

Due to the unique nature of the homicide (being tied to
a tree naked and then strangled), police reviewed a
similar assault reported on August 15, 1994. The victim,
Stanley Burden, was a high school drop-out who, like
Montgomery, had difficulty keeping a steady job and had
physical features similar to those of Montgomery. The
report indicated that Burden met Conahan, who offered to
pay him $100 to $150 to pose for nude photographs. Burden
agreed and Conahan drove him to a rocky dirt road in a
secluded area where Conahan pulled out a duffle bag with
a tarp and a Polaroid camera. The two men headed into
the woods where Conahan laid the tarp out and asked

Burden to take off his shirt and show a little hip. After taking numerous pictures of Burden, Conahan then took out a new package of clothesline so he could get some bondage pictures. He asked Burden to step close to a nearby tree and then clipped the clothesline in several pieces, draping them over Burden to make it look like bondage. Conahan moved behind Burden, snapped the rope tightly around him, pulled his hands behind the tree, placed ropes around his legs and chest, and wrapped the rope twice around Burden's neck. Conahan then performed oral sex on Burden and attempted to sodomize him. Burden fought to position himself in the middle of the tree while Conahan tried to pull him to the side to have anal sex. After many unsuccessful attempts, Conahan snapped the rope around Burden's neck, placed his foot against the tree, and pulled on the rope in an attempt to strangle Burden, who tried to slide around the tree to keep his windpipe open. Conahan hit Burden in the head and unsuccessfully attempted to strangle him for thirty minutes. Conahan asked Burden why he would not die and finally gave up, gathered his possessions, and left. Burden freed himself, went to a local hospital, and received treatment for his injuries. The police located the crime scene and found that one of the melaleuca trees had ligature indentions that corresponded with Burden's injuries.

Based on this information, the police began an undercover investigation of Conahan. On May 24, 1996, Deputy Scott Clemens was approached by Conahan at Kiwanis Park, and Conahan offered Clemens $7 to show his penis or $20 if Clemens would allow Conahan to perform fellatio. Clemens refused the offer and the next day returned to the park where he again encountered Conahan, who offered him $150 to pose for nude photos.

On May 31, 1996, pursuant to a warrant, the police searched Conahan's residence and vehicles and obtained paint samples from his father's Mercury Capri, which Conahan occasionally used. The police then compared paint samples from the Capri with a paint chip from the victim's body and found that they were indistinguishable.

On February 25, 1997, Conahan was indicted for first-degree premeditated murder, first-degree felony murder, kidnapping, and sexual battery of Richard Montgomery. In

the guilt phase of his trial, Conahan waived his right
to trial by jury. The State presented evidence of the
manner in which the victim's body was found and evidence
obtained from the autopsy and the searches of Conahan's
residence and vehicles. The State also presented
evidence that on the day of Montgomery's disappearance,
April 16, 1996, at 6:07 p.m., Conahan's credit card was
used to purchase clothesline, Polaroid film, pliers, and
a utility knife from a Wal-Mart store in Punta Gorda.
Still photos showed that minutes later, at 6:12 p.m.,
Conahan withdrew funds from an ATM which was located
close to the Wal-Mart.

The trial court permitted the State to introduce
Williams[1] rule evidence of Burden's attempted murder and
sexual battery, ruling that the evidence was
sufficiently similar to the evidence leading up to
Montgomery's death so as to constitute a unique modus
operandi sufficient to establish the identity of
Montgomery's murderer. After the guilt phase of the
trial was completed, the trial court found and
adjudicated Conahan guilty of first-degree premeditated
murder and kidnapping.

On November 1, 1999, the penalty phase of Conahan's trial
was conducted before a jury at which time photos taken
at the crime scene of the victim's body were published,
and Deputy Gandy testified relative to the crime scene
and how the body was found. Gandy further testified that
during an interview Conahan told him that he had a
fantasy involving bondage and sex.

The medical examiner, Dr. Carol Huser, testified
regarding the autopsy report prepared by Dr. Imami.[2]
After examining Dr. Imami's report and viewing the
autopsy photographs, Dr. Huser concluded that Montgomery
died by ligature strangulation. The autopsy photographs
were published to the jury. Dr. Huser also testified
that being killed in such a manner required applying
pressure for a length of time notwithstanding the fact
that the victim loses consciousness after only a few

---

[1] Williams v. State, 110 So. 2d 654 (Fla. 1959).

[2] Dr. Imami, the medical examiner who conducted the autopsy
of Richard Montgomery, was out of the country and unavailable to
testify at the penalty phase.

seconds. She further opined that to be killed by strangulation would be terrifying.

Conahan's aunt, Betty Wilson, testified on behalf of the defense that Conahan was a jovial, personable individual who participated in family activities and cared for his ailing mother before she died. Robert Lindy and his daughter Nancy Thomson, the father and sister of Hal Lindy, who was Conahan's roommate and lover when he lived in Chicago, testified that Conahan was like another son and brother to them. Conahan was instrumental in helping Hal and Nancy overcome alcoholism, was considered one of the family, and was included in many family functions. Thereafter, the defense rested its case.

Before the jury deliberated, the trial court gave instructions relative to the following aggravators: (1) the murder was heinous, atrocious, or cruel (HAC); (2) the murder was cold, calculated, and premeditated (CCP); and (3) the murder was committed during the course of a kidnapping. By a vote of twelve to zero, the jury recommended the death penalty. A Spencer[3] hearing was held on November 5, 1999, and on December 10, 1999, Conahan was sentenced to death for the first-degree murder of Richard Montgomery and to fifteen years' imprisonment for kidnapping.

Conahan v. State, 844 So. 2d 629, 632 (Fla. 2003).

The Florida Supreme Court went on to find: (1) the trial court did not err in denying Conahan's motions for acquittal; (2) the trial court correctly instructed the sentencing jury on aggravating factors; (3) the prosecutor made an improper comment during the State's opening statement, but allowing it was harmless error; (4) the trial court correctly overruled two objections during the State's closing argument; (5) the trial court properly admitted autopsy photos and photos of the crime scene; and (6) the

---

[3] Spencer v. State, 615 So. 2d 688 (Fla. 1993).

death penalty here is a proportionate punishment when compared with other death-penalty cases.  Id. at 638-43.  The United States Supreme Court denied certiorari.  Conahan v. Florida, 540 U.S. 895 (2003).

Conahan sought postconviction relief in state court by filing a motion under Florida Rule of Criminal Procedure 3.851.  The postconviction court denied the motion after an evidentiary hearing, and the Florida Supreme Court affirmed.  Conahan v. State, 118 So. 3d 718 (Fla. 2013).

Conahan then filed the petition that commenced this action, raising seven grounds.  (Doc. #1).  On February 2, 2016, Conahan filed another state postconviction motion and sought a stay of this federal case.  (Doc. #43).  The Court obliged, granting the stay.  (Docs. #46, 58).  The state postconviction court denied the successive Rule 3.851 motion, and the Florida Supreme Court affirmed.  Conahan v. State, No. SC16-1153, 2017 WL 656306 (Fla. Feb. 17, 2017); Conahan v. State, 258 So. 3d 1237 (Fla. 2018).

The stay was lifted (Doc. #64), and Conahan filed two supplements to his federal habeas petition, each adding a new ground.  (Docs. #57 and #62).  All grounds have been fully briefed and are ripe for review.

## II.  Applicable Habeas Law

### a. AEDPA

The Antiterrorism Effective Death Penalty Act (AEDPA) governs

a state prisoner's petition for habeas corpus relief.  28 U.S.C.
§ 2254.  Relief may only be granted on a claim adjudicated on the
merits in state court if the adjudication:

> (1)   resulted in a decision that was contrary to, or
>       involved an unreasonable application of, clearly
>       established Federal law, as determined by the
>       Supreme Court of the United States; or
> (2)   resulted in a decision that was based on an
>       unreasonable determination of the facts in light of
>       the evidence presented in the State court
>       proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and difficult
to meet.  White v. Woodall, 134 S. Ct. 1697, 1702 (2014).  A state
court's violation of state law is not enough to show that a
petitioner is in custody in violation of the "Constitution or laws
or treaties of the United States."  28 U.S.C. § 2254(a); Wilson
v. Corcoran, 562 U.S. 1, 16 (2010).

"Clearly established federal law" consists of the governing
legal principles set forth in the decisions of the United States
Supreme Court when the state court issued its decision.  White,
134 S. Ct. at 1702; Casey v. Musladin, 549 U.S. 70, 74 (2006)
(citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  Habeas
relief is appropriate only if the state court decision was
"contrary to, or an unreasonable application of," that federal
law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary to"
clearly established federal law if the state court either: (1)
applied a rule that contradicts the governing law set forth by

Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. Ward v. Hall, 592 F.3d 1144, 1155 (11th Cir. 2010); Mitchell v. Esparza, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, Brown v. Payton, 544 U.S. 133, 134 (2005); Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Bottoson, 234 F.3d at 531 (quoting Williams, 529 U.S. at 406).

When reviewing a claim under 28 U.S.C. § 2254(d), a federal court must remember that any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Burt v. Titlow, 134 S. Ct. 10, 15 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-

minded jurists could disagree on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011).  "[T]his standard is difficult to meet because it was meant to be." <u>Sexton v. Beaudreaux</u>, 138 S. Ct. 2555, 2558 (2018).

### b. Exhaustion and Procedural Default

AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless a petitioner has exhausted all means of relief available under state law.  Failure to exhaust occurs "when a petitioner has not 'fairly presented' every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." <u>Pope v. Sec'y for Dep't of Corr.</u>, 680 F.3d 1271, 1284 (11th Cir. 2012) (quoting <u>Mason v. Allen</u>, 605 F.3d 1114, 1119 (11th Cir. 2010)). The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim. <u>Snowden v. Singletary</u>, 135 F.3d 732, 735 (11th Cir. 1998).

Procedural defaults generally arise in two ways:

(1) where the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred; or (2) where the petitioner never raised the claim in state court, and it is obvious that the state court would hold it to be procedurally barred if it were raised now.

<u>Cortes v. Gladish</u>, 216 F. App'x 897, 899 (11th Cir. 2007).  A federal habeas court may consider a procedurally barred claim if

- 9 -

(1) petitioner shows "adequate cause and actual prejudice," or (2) "the failure to consider the claim would result in a fundamental miscarriage of justice."   Id. (citing Coleman v. Thompson, 501 U.S. 722, 749-50 (1991)).

### c. Ineffective Assistance of Counsel

In Strickland v. Washington, the Supreme Court established a two-part test for determining whether a convicted person may have relief for ineffective assistance of counsel.  466 U.S. 668, 687-88 (1984).  A petitioner must establish: (1) counsel's performance was deficient and fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense.  Id.

When considering the first prong, "courts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  Sealey v. Warden, 954 F.3d 1338, 1354 (11th Cir. 2020) (quoting Strickland, 466 U.S. at 689).  And "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Franks v. GDCP Warden, 975 F.3d 1165, 1176 (11th Cir. 2020) (quoting Richter, 562 U.S. at 101).  Thus, a habeas petitioner must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct."  Id.  This is a "doubly deferential"

standard of review that gives both the state court and the petitioner's attorney the benefit of the doubt. <u>Burt</u>, 134 S. Ct. at 13 (citing <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1403 (2011)).

The second prong requires the petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Sealey</u>, 954 F.3d at 1355 (quoting <u>Strickand</u>, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> The critical question on federal habeas review is not whether this Court can see a substantial likelihood of a different result had defense counsel taken a different approach. <u>Mays v. Hines</u>, 141 S. Ct. 1145, 1149 (2021). All that matters is whether the state court, "notwithstanding its substantial 'latitude to reasonably determine that a defendant has not [shown prejudice],' still managed to blunder so badly that every fairminded jurist would disagree." <u>Id.</u> (quoting <u>Knowles v. Mirazayance</u>, 556 U.S. 111, 123 (2009)).

"An ineffective-assistance claim can be decided on either the deficiency or prejudice prong." <u>Sealey</u>, 954 F.3d at 1355. And "[w]hile the <u>Strickland</u> standard is itself hard to meet, 'establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.'" <u>Id.</u> (quoting <u>Richter</u>, 562 U.S. at 105).

## III. Analysis of Issues

### a. Ground 1: Trial counsel failed to adequately investigate and prepare a defense

Attorneys Mark W. Ahlbrand and Paul Sullivan represented Conahan at the trial level.  Ahlbrand led the effort on the guilt phase, and Sullivan primarily handled the sentencing phase. Conahan argues Ahlbrand provided ineffective assistance of counsel in the guilt phase, which renders the death sentence unreliable. Conahan asserts four sub-grounds, each raising an alleged deficiency in Ahlbrand's performance.  The Court denies three of the sub-grounds, and Conahan has withdrawn the fourth.

### i. <u>Richardson</u>[4] hearing

The victim's mother, Mary Montgomery-West[5] surprised Ahlbrand on cross-examination with testimony that her son had told her about meeting Conahan.  (Doc. #89-3 at 787-88).  The testimony—which is relevant to several habeas grounds—was as follows:

> Q    Did your son ever tell you that he had met a man named Danny or that there was a man that was going to offer money for anything?  Did he ever confide in you that there was –
>
> A    He told me the last time I saw him, which was on March 23rd, it was a Saturday, and I was trying to do bills.  And Jeff's truck had broken down at out house, so Danny and his wife, Terri, and Carla and Jeff and Richard were all over there that Saturday.

---

[4] <u>Richardson v. State</u>, 246 So. 2d 771 (Fla. 1971).

[5] The state court record alternatingly refers to the victim's mother as Mary Montgomery, Mary West, and Mary Montgomery-West. This Court will use "Montgomery-West."

- 12 -

Q    Now, when you saw Danny, you're not referring to Mr. Conahan, are you?

A    No; my son.  My son.  Anyway, he had come in and he was wanting to talk to me and I was trying to do my bills and he was interrupting.  It was just like when he was a child.  I said, Let me do this and then we'll talk.  But anyway, it ended up being we were talking. He wanted to tell me about a new friend he had made.

Q    How did he describe him?

A    I remember him telling me his name and I said that sounds like – I knew people with the name of Carnahan in North Fairfield, Ohio.  That's where I grew up.  He said, No, it's a name that – like that.  I said, You sound like Nana because you're leaving the R out. He said, No, Mom.  It's Conahan.

Q    Why would you have never told this to the police?

A    I thought I did the night I made my statement.

Q    But you didn't?

A    I remember telling them that – there's a lot in my statement that I remember saying that isn't on the tape.

Q    Okay.  So you believe at this point in light of the fact that Mr. Conahan is on trial that you told the police that your son had met Mr. Conahan, or a Mr. Conahan?

A    A Mr. Conahan.

Q    Did you pursue that with him?  I mean, I'm in for a penny and for a pound now.  I might as well go ahead.  I mean, did you ask him –

A    Nobody called me or anything.  I remember I told Mr. Hobbs – I called him up and I said, How come nobody's asked me about anything because of the name that I had said and he said he remembers something about friends and he went back and looked.  I never heard from

him again.   I found out just recently when I got my
deposition that's not in there.   It says, inaudible,
inaudible.  I'm sure I was crying.

     Q   When you told Mr. Hobbs about this, had Mr.
Conahan already been arrested and in the paper?

     A   Yes, he had been.

(Doc. #89-3 at 786-88).   The State elicited more details on
redirect (that testimony is block-quoted below in the section
discussing Ground 2).   Ahlbrand attempted to impeach Montgomery-
West on re-cross with a transcript of the statement she gave police
two days after her son's death.   Montgomery-West acknowledged the
transcript did not include any mention that the victim had contact
with Conahan, but she pointed to page 24 of the document: "And
it's right in here where I start talking and I think it was in the
part where it said inaudible, inaudible.  And there's – a lot of
what I said isn't there."  (Id. at 794).

     In his Rule 3.851 motion, Conahan argued Ahlbrand should have
requested a Richardson hearing.  A Florida trial court may hold a
Richardson hearing to determine whether the State committed a
discovery violation and, if so, whether the violation prejudiced
the defendant's ability to prepare for trial.  Richardson, 246 So.
2d at 774-75.  The postconviction court heard extensive evidence
on the issue and found no discovery violation, and therefore no
cause for a Richardson hearing.  (Doc. #89-5 at 1096).   The

- 14 -

Florida Supreme Court determined that Conahan failed to satisfy
either prong of Strickland:

> First, Conahan claims that trial counsel was ineffective
> for failing to demand a Richardson hearing when Mrs.
> Montgomery, the victim's mother, testified to a matter
> that was not in the transcript of the recorded statement
> she gave to law enforcement. Specifically, during cross-
> examination, Mrs. Montgomery testified that her son had
> told her he had met a man named Conahan and on re-direct
> stated that her son had told her that Conahan lived in
> Punta Gorda Isles, was a nurse, and had been in the Navy.
> When asked why she had never told this information to
> police she stated that she "thought" she had when she
> gave her recorded statement, proposing that the
> information was described as "inaudible" in the
> transcript. Because Conahan has failed to establish
> deficiency or prejudice, we affirm the circuit court's
> denial of this claim.
>
> Specifically, Conahan has failed to demonstrate how
> counsel's actions were not reasonable given the facts of
> the case and counsel's perspective at the time. Trial
> counsel testified at the evidentiary hearing that he did
> not object to the testimony because it was elicited as
> a result of a direct question on cross-examination and
> he could not figure out a way to "unring the bell."
> Instead, trial counsel attempted to impeach Mrs.
> Montgomery's testimony. This Court has held that counsel
> will not be held ineffective if "alternative courses
> have been considered and rejected and counsel's decision
> was reasonable under the norms of professional conduct."
> Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000).
>
> Additionally, Conahan failed to establish prejudice.
> Even if Mrs. Montgomery's testimony was stricken after
> a Richardson hearing, the outcome would have been the
> same and confidence is not undermined because there was
> other evidence linking the victim and Conahan, such as
> the testimony of Whitaker and Newman.[6] Newman had been
> Conahan's cellmate at one time and testified at trial
> that Conahan had told him he knew the victim, Mr.

---

[6] The jailhouse witness in this case is named John Cecil
Neuman. The trial transcript and subsequent state court records
and opinions misspelled his name as "Newman."

> Montgomery. Specifically, Newman testified that Conahan
> had said he had been on beer runs with Montgomery, had
> been to Montgomery's house, and that "Montgomery was a
> mistake." And Whitaker and the victim were roommates at
> one time, and Whitaker testified that Conahan had come
> to his home looking for Montgomery.

Conahan v. State, 118 So. 3d 718, 727 (Fla. 2013).

The Florida Supreme Court reasonably applied Strickland. A Richardson hearing would have given Conahan an opportunity to explore whether the State violated discovery rules and whether there was any resulting prejudice. But Montgomery-West's testimony did not show the State withheld any discovery. She believed the relevant part of her statement was inaudible because she was crying, so her testimony did not suggest the existence of a separate document the government withheld. Moreover, the postconviction heard the evidence Conahan could have proffered in a Richardson hearing and found no discovery violation. Thus, a Richardson hearing would have been futile.

Federal habeas courts "must defer to the state's construction of its own law" when an attorney's alleged failure turns on state law. Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1295 (11th Cir. 2017) (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)). Such deference is especially important when considering Strickland claims because they can "drag federal courts into resolving questions of state law." Shinn v. Kayer, 141 S. Ct. 517, 523 (2020). This Court accepts as correct the state courts'

determination that the prosecution did not violate state discovery rules, so Conahan was not entitled to relief under Richardson. Conahan was not prejudiced by Ahlbrand's failure to request a futile Richardson hearing.  The Florida Supreme Court's denial of this sub-ground was a reasonable application of Strickland.

### ii. Forensic audio expert

Conahan next argues Ahlbrand should have retained an audio expert to analyze the tape of Montgomery-West's statement to the police.  Conahan's postconviction counsel did hire such an expert, and he testified that Montgomery-West did not utter Conahan's name in the recorded interview, even during the parts described as inaudible in the original transcript.  (Doc. #89-6 at 356-58). The State stipulated that Montgomery-West's recorded statements did not contain Conahan's name.  The postconviction court found— based on the testimony of prosecutor Robert A. Lee—that Montgomery-West could have provided Conahan's name in an unrecorded statement, and it held that Conahan failed to establish either prong of Strickland.  (Doc. #89-5 at 1097).

The Florida Supreme Court affirmed because Conahan failed to show prejudice:

> In this case, even if counsel had obtained an audio
> expert to analyze the statement, it would not have
> changed the nature of Mrs. Montgomery's testimony that
> she "thought" she had told officers this information
> during the interview in which the recorded statement was
> made.  Moreover, having a more accurate transcript would
> not have broken the evidentiary link between Conahan and

- 17 -

> the victim because there were two other witnesses,
> Whitaker and Newman, who established that Conahan and
> the victim knew each other.  Therefore, there is not a
> reasonable probability of a different outcome.  Our
> confidence in the outcome is not undermined.

Conahan v. State, 118 So. 3d 718, 728 (Fla. 2013).  Conahan attacks

the Florida Supreme Court's decision because (1) an expert could

have impeached Montgomery-West and (2) Whitaker and Neuman were

unreliable witnesses.

Federal habeas courts must give state courts substantial

latitude when evaluating the prejudice prong of Strickland claims.

Mays, 141 S. Ct. at 1149.  The Florida Supreme Court reasonably

found that Whitaker and Neuman established a link between Conahan

and the victim, and that impeaching Montgomery-West would not have

broken that link.  Despite his attacks on the reliability of

Whitaker and Neuman, Conahan fails to establish that the Florida

Supreme Court "blunder[ed] so badly that every fairminded jurist

would disagree."  Id.  What is more, the audio expert's conclusion

is consistent with Montgomery-West's trial testimony.  She

acknowledged the tape did not capture her comments about Conahan:

"I remember telling them that – there's a lot in my statement that

I remember saying that isn't on the tape."  (Doc. #89-3 at 788).

Denial of this sub-ground was a reasonable application of

Strickland.

### iii. **Williams** rule evidence

Conahan asserts Ahlbrand failed to adequately object to the evidence admitted under Williams v. State, 110 So. 2d 654 (Fla. 1959)—primarily, evidence that Conahan attacked and attempted to kill Stanley Burden in the same manner that Montgomery was murdered.  Conahan's argument focuses almost entirely on the trial court's decision to admit the evidence, rather then Ahlbrand's performance.  In other words, Conahan attempts to shoehorn non-Strickland arguments into a Strickland claim, the same tactic he used in his state postconviction motion.  (See Doc. #89-4 at 1258-60).  The postconviction court rejected the ineffective-assistance claim because Ahlbrand objected to the Williams evidence repeatedly, and it denied the non-Strickland arguments because they were procedurally barred. (Doc. #89-5 at 1095; see also Doc. #89-4 at 1520-21).

The Florida Supreme Court found no merit in the Strickland part of this sub-ground:

> The claim is conclusively refuted by the record, which indicates that trial counsel repeatedly objected to the Williams rule evidence and that the trial court treated this as a standing objection.  As for Conahan's challenge to the sufficiency and detail of the objections, the record demonstrates that trial counsel went to great lengths to point out differences between the assault on Stanley Burden and the murder of Richard Montgomery and presented detailed arguments as to why the other Williams rule evidence should not be admitted. This Court has repeatedly held that "[c]ounsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions."

> Occicone, 768 So. 2d at 1048; see also Chandler v. State,
> 848 So. 2d 1031, 1045-46 (Fla. 2003) (holding that
> disagreeing with trial counsel's strategy of not
> vigorously challenging the Williams rule evidence did
> not mean that trial counsel was ineffective).

Conahan, 118 So. 3d at 728. The Florida Supreme Court also agreed

that Conahan's non-Strickland sub-claims were procedurally barred:

> We do not discuss in detail Conahan's claim that the
> trial court erred in summarily denying his
> ineffectiveness of trial counsel claim that the Williams
> rule evidence was not established by clear and
> convincing evidence, was not sufficiently similar to the
> charged offense, and became a "feature of the trial"
> because we find the circuit court properly determined
> that this claim was procedurally barred. Conahan should
> have and could have raised this issue on direct appeal.
> See Connor v. State, 979 So. 2d 852, 868 (Fla. 2007);
> Franqui v. State, 965 So. 2d 22, 35 (Fla. 2007); Spencer
> v. State, 842 So. 2d 52, 60-61 (Fla. 2003). Moreover,
> as explained when addressing his habeas petition,
> Conahan failed to establish that the admission of the
> Williams rule evidence amounted to fundamental error.

Id. at 728 n.6.

The Florida Supreme Court's denial of Conahan's ineffective-

assistance claim was a reasonable application of Strickland. See

Strickland, 466 U.S. at 689 ("A fair assessment of attorney

performance requires that every effort be made to eliminate the

distorting effects of hindsight, to reconstruct the circumstances

of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time."). The underlying issue here

is the application of the Williams rule, a Florida evidentiary

rule. The Florida Supreme Court is the final arbiter of Florida

law, see Pinkney, supra, and it found Ahlbrand's objections to the

<u>Williams</u> rule evidence reasonable.  The record supports that finding.  Ahlbrand made a thorough and lengthy argument against admission of the <u>Williams</u> rule evidence.  (Doc. #89-3 at 1548-65).

The rest of this sub-ground challenges the trial court's admission of <u>Williams</u> rule evidence, not Ahlbrand's performance. Florida law required Conahan to raise those arguments on direct appeal.  See <u>Spencer v. State</u>, 842 So. 2d 52, 60 (Fla. 2003).  The Florida Supreme Court correctly applied a state procedural default principle to find the sub-claims barred.  As a result, they are procedurally barred in federal court.  See <u>Cortes</u>, <u>supra</u>.

### iv. Conclusions of FDLE witnesses

Conahan next faults Ahlbrand for failing to investigate or present any evidence to undermine the scientific conclusions of two witnesses from the Florida Department of Law Enforcement.  In his Reply, Conahan concedes that he failed to exhaust this sub-ground and withdraws it.  (Doc. #38 at 11).

### b. Ground 2: The victim's mother gave false material testimony

Conahan claims the State violated <u>Giglio v. United States</u>, 405 U.S. 150 (1972) by knowingly using false testimony of Montgomery-West.  The testimony at issue began in Ahlbrand's cross-examination of Montgomery-West, block-quoted above.  The State elicited more details on redirect:

> Q    Mrs. West, this conversation that you had with your
> son that you were just asked about where he mentioned

the name Conahan and you thought at first he said
Carnahan, did he give you any information about this
individual Conahan as to where he worked or his
background?

A    I remember him telling me that his new friend lived
in Punta Gorda Isles, that he had been in the Navy
discharge and he was a nurse who worked at Medical Center
where I had worked for many years.

Q    All right.  And did he tell you – did you mention
anything to him about, in turn, whether it was – let me
rephrase it.

     Was anything said about the age of Mr. Conahan?

A    I remember him being much older.  I said, Why are
you hanging around with somebody so much older than you
are?

Q    Okay.  Now, in that same conversation, did your son
mention to you anything about nude photographs?

A    He told me somebody had offered him $200 to pose
for nude pictures.

Q    Okay.

A    He didn't tell me who.  He refused to tell me who.

Q    He did not specifically say it was Mr. Conahan, but
it was in the same conversation?

A    It was in the same conversation.

Q    And in response to that, what did you tell your
son?

A    I told him about a psychopathic personality that
would lure somebody like my son, who is trusting and
naïve, because he was naive, out; somebody that he didn't
know very well and do things to him, sexually abuse him,
kill him.

     THE DEFENDANT: You're a liar.

THE WITNESS: He didn't believe me.  He says, No one will kill me.  I'll kill him first, like that, and –

MR. AHLBRAND: Judge, we're going to ask for a five-minute recess.

THE COURT: For what reason?

MR. AHLBRAND: I need to converse with my client. We can do it in place.  Three minutes, please.

MR. LEE: I only have one or two more questions, Your Honor.  I prefer that we finish the testimony.

THE COURT: All right.  Let's finish.

BY MR. LEE:

Q    And what was Richard's response when you warned him about this?

A    He says, Nobody will kill me.  I'll kill them first.  He didn't believe it could happen.

Q    Did not believe it could happen?

A    (Nodded head.)

(Doc. #89-3 at 790-92).

The postconviction court rejected Conahan's Giglio claim, and

the Florida Supreme Court affirmed:

> To establish a Giglio violation, three prongs must be shown: (1) the testimony was false; (2) the prosecutor knew it was false; and (3) the testimony was material. Guzman v. State, 868 So.2d 498, 505 (Fla. 2003) (citing Ventura v. State, 794 So.2d 553, 562 (Fla. 2001)). If the defendant successfully establishes the first two prongs, then the State bears the burden of proving that the testimony was not material by showing that there is no reasonable possibility that it could have affected the verdict because it was harmless beyond a reasonable doubt. See Johnson v. State, 44 So. 3d 51, 64-65 (Fla. 2010); Guzman, 868 So. 2d at 506-07. In evaluating Giglio claims, this Court applies a mixed standard of review,

deferring to the trial court's factual findings that are supported by competent, substantial evidence and reviewing the application of the law to those facts de novo. Suggs v. State, 923 So.2d 419, 426 (Fla. 2005) (citing Sochor, 883 So.2d at 785).

In this case, Conahan has failed to establish that Mrs. Montgomery's testimony was false. Mrs. Montgomery qualified her testimony, stating that she "thought" she told law enforcement this information when she gave her recorded statement. However, the State stipulated at the evidentiary hearing that the name Conahan does not appear in the recorded statement, which tends to show that her self-qualified "thought" was mistaken, not necessarily that her testimony was false. Additionally, the transcript of the recorded statement indicates that Mrs. Montgomery provided the officers taking her statement with some information prior to the tape being turned on. Perhaps Mrs. Montgomery relayed the information at that point. Furthermore, there was additional testimony presented at the evidentiary hearing that indicates Mrs. Montgomery had interactions with other law enforcement officers and made an oral statement to the prosecutor concerning this matter, the circumstances and contents of which collateral counsel did not pursue at the evidentiary hearing. Therefore, Conahan has failed to establish that Mrs. Montgomery's testimony was false.

Additionally, the State has established that the testimony was immaterial because there was no reasonable possibility of a different verdict as it was harmless beyond a reasonable doubt. See Johnson, 44 So.3d at 64–65; Guzman, 868 So.2d at 506–07 (defendant is not entitled to relief if State can prove that presentation of false testimony was harmless beyond a reasonable doubt). As the State demonstrates, the testimony from Newman and Whitaker established that the victim and the defendant knew one another. Moreover, the admission of the Williams Rule evidence was not contingent upon Mrs. Montgomery's testimony. As we noted on direct appeal, Conahan killed Montgomery in the same manner in which he attempted to kill Stanley Burden. Montgomery and Burden were similar physically; neither one completed high school; both had difficulty in maintaining employment and were in need of money when Conahan solicited them to pose nude for money in a secluded wooded area. Both were

tied to a tree and suffered similar abrasions and
ligature wounds. <u>Conahan</u>, 844 So.2d at 635.

Accordingly, Conahan has failed to establish that a
<u>Giglio</u> violation occurred, and we affirm the circuit
court's denial of relief.

<u>Conahan</u>, 118 So. 3d at 728-29.

The Florida Supreme Court reasonably applied <u>Giglio</u> to the
facts in the record. Conahan offered no evidence challenging the
truth of Montgomery-West's testimony describing a conversation she
had with Montgomery about Conahan. Rather, Conahan presented
evidence contrary to Montgomery-West's testimony about when she
reported the conversation to police. But that testimony had been
equivocal. Montgomery-West made it clear she <u>thought</u> she told
police about the conversation during her recorded statement.
Additionally, the Florida Supreme Court identified other times
Montgomery-West might have relayed the information to police, and
those findings are consistent with the record.

Conahan also failed to demonstrate that prosecutor Lee knew
of any false testimony. Lee testified that Montgomery-West told
him about the conversation before trial (though it is not clear
when that occurred). (Doc. #89-6 at 1006-07). And he denied
having any belief or indication that Montgomery-West testified
falsely. (<u>Id.</u> at 1013). There is no evidence that Lee
disbelieved Montgomery-West.

Conahan only offers evidence challenging Montgomery-West's testimony about when she reported the conversation to police, not her testimony about the conversation itself. The Florida Supreme Court nonetheless considered the materiality of the conversation itself and found it duplicative of other evidence linking Conahan and Montgomery—namely, the testimony of Neuman and Whitaker. The Court finds that fair-minded jurists could come to these conclusions, which precludes habeas relief. See, Harrington, supra.

The Florida Supreme Court reasonably applied the correct legal principles to Conahan's Giglio claim. Ground 2 is denied.

### c. Ground 3: The State withheld material and exculpatory evidence and presented misleading evidence

Conahan accuses the State of violating Brady and Giglio when it failed to disclose a recording made between Detective Weir and Conahan during a May 29, 1996 sting operation. Conahan claims, "In that conversation, Detective Weir offered to be photographed in bondage by Mr. Conahan, who refused the offer and instead proposed performing consensual sexual acts on Weir." (Doc. #26 at 37). Conahan argues the recording is exculpatory and would have impacted the admissibility of Weir's testimony.

The post-conviction court denied this ground, and the Florida Supreme Court affirmed:

> In order to establish a Brady violation, three elements must be shown: (1) the evidence at issue was favorable

to the defendant, either because it is exculpatory or is impeaching; (2) the evidence was suppressed, willfully or inadvertently, by the State; and (3) because the evidence was material, its suppression resulted in prejudice. <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); <u>see also</u> <u>Johnson v. State</u>, 921 So.2d 490, 507 (Fla. 2005); <u>Rogers v. State</u>, 782 So.2d 373, 378 (Fla. 2001). To establish the materiality element of <u>Brady</u>, the defendant must demonstrate "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>Guzman</u>, 868 So.2d at 506 (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> (quoting <u>Bagley</u>, 473 U.S. at 682, 105 S.Ct. 3375).

When addressing <u>Brady</u> claims, this Court utilizes a mixed standard of review, "'defer[ring] to the factual findings made by the trial court to the extent they are supported by competent, substantial evidence, but review[ing] de novo the application of those facts to the law.'" <u>Sochor</u>, 883 So.2d at 785 (quoting <u>Lightbourne v. State</u>, 841 So.2d 431, 437–38 (Fla. 2003)).

First, Conahan has failed to establish that the recording at issue actually exists and that the State suppressed this evidence. None of the witnesses at the evidentiary hearing could conclusively say whether or not a tape had been made of the May 29, 1996, undercover operation, and no one had ever seen or heard a recording from that day. Testimony or evidence that recordings were made on other days or in other operations has no bearing on whether a recording was made on May 29. Furthermore, Conahan has not presented any evidence that the State suppressed the alleged recording. Therefore, his <u>Brady</u> claim was properly denied on this basis alone. <u>See</u> <u>Wyatt v. State</u>, 71 So.3d 86, 106 (Fla. 2011) (denying defendant's <u>Brady</u> claim because he failed to establish "the existence of evidence [for the State] to withhold").

Second, Conahan has failed to establish that the evidence is either exculpatory or impeaching. Conahan claims that the contents of the tape would have shown that he was interested in seeking sex for money and was

not interested in soliciting men for nude photographs.
However, this very contention is refuted by the record.
The testimony from the undercover officers demonstrates
that on separate occasions Conahan solicited the
officers for sex acts and to pose in nude bondage
photographs. Additionally, Conahan admitted during his
testimony at trial that he solicited Mr. Burden to pose
in nude bondage photographs, who was the victim of the
similar assault that was admitted as <u>Williams</u> Rule
evidence. Finally, Mr. Burden's independent testimony of
his encounter with Conahan also refutes the argument
that Conahan did not solicit men for nude photographs.
Therefore, if this recording exists, it would not have
the exculpatory effect claimed by the defendant because
other evidence demonstrated the defendant's solicitation
of men for photographs.

<u>Conahan</u>, 118 So. 3d at 729.

Conahan argues the Florida Supreme Court's findings about the existence (or non-existence) of the alleged recording were unreasonable, based on the post-conviction testimony of several police officers. But none of that evidence contradicts the state court's opinion.

- Officer Weir testified that he wore a "transmitting device" during the May 29, 1996 undercover operation. He knew his backup team was monitoring the audio, and while he assumed it was being recorded, he never saw a tape. (Doc. #89-6 at 678-80). Weir was only certain that one of his four undercover operations was recorded. (<u>Id.</u> at 683).

- Officer Richard Goff was also involved in the May 29, 1996 operation. He had a listening device, but not a

recorder.   He testified that somebody usually has a recording device, but he did not know if another officer recorded on May 29.  (Id. at 689-91).

- Deputy Sheriff Ricky Lee Hobbs authorized the undercover operations.   He testified that the sheriff's office "generally recorded, when possible[,]" but he did not give specific direction to record in this case.  (Id. at 710).  Hobbs wrote in a report that the conversations between Conahan and Wier were recorded, but that was not based on personal knowledge, and Hobbs did not know for a fact whether the May 29, 1996 operation was recorded. (Id. at 710-13).

- Detective John Columbia heard from someone that officers Padula and Goff made recordings.  (Id. at 674).

- Detective Scott Clemens testified he wore a "bug" each time he interacted with Conahan undercover.  He assumed the conversations were recorded, but he did not do any recording himself.  (Id. at 727-29).

Conahan did not present any direct evidence that his May 29, 1996 conversation with Wier was recorded.  None of the officers questioned had personal knowledge of a recording.  The Florida Supreme Court thus reasonably found that Conahan failed to prove a recording existed.

Even if a recording did exist, the state court reasonably found the purported contents would not have been exculpatory. There was ample evidence at trial that Conahan solicited men for nude photo shoots, including Conahan's own admission that he asked Burden to pose nude.  (See Doc. #89-3 at 1913).  Evidence that Conahan declined Weir's offer on May 29, 1996 would not have meaningfully helped Conahan's case.  Ground 3 is denied.

### d. Ground 4: The State committed persistent prosecutorial misconduct

Conahan accuses prosecutor Lee of the following alleged misconduct: (1) delay and dismissal of trial charges stemming from the Burden attack to preserve Williams rule evidence; (2) use of testimony from Hal Linde to show Conahan's bad character and propensity to violence; (3) failure to disclose a recording of the May 29, 1996 conversation between Conahan and Weir; (4) use of Montgomery-West's false testimony; (5) improper Williams rule argument about Kenneth Smith; (6) misrepresentation of John Neuman's testimony; (7) improper argument about Montgomery-West's testimony; and (8) improper argument that Conahan removed Montgomery's genitals.  Conahan argues the cumulative effect of this conduct violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

Conahan asserted different claims of prosecutorial misconduct on direct appeal.  The Florida Supreme Court found the State made

improper comments during its opening statement, but concluded this
was harmless error.   Conahan v. State, 844 So. 2d 629, 638-40
(Fla. 2003).   Conahan raised additional claims of prosecutorial
misconduct in his Rule 3.851 motion, but the Florida Supreme Court
found them procedurally barred:

> Conahan's additional prosecutorial misconduct claims
> should have or could have been raised on direct appeal.
> See Franqui v. State, 965 So. 2d at 35 (holding the
> defendant's claim that improper prosecutorial comments
> constituted fundamental error was procedurally barred
> because it could have been raised as fundamental error
> on direct appeal); Spencer, 842 So. 2d at 68 (holding
> that "[i]ssues which either were or could have been
> litigated…upon direct appeal are not cognizable through
> collateral attack") (quoting Smith v. State, 445 So. 2d
> 323, 325 (Fla. 1983)).   Therefore, Conahan's claims are
> procedurally barred, and we affirm the circuit court's
> denial.

Conahan, 118 So. 3d at 732.

Conahan also argued in a state habeas petition that his
appellate counsel should have asserted five prosecutorial-
misconduct claims.   The Florida Supreme Court found two of those
claims procedurally barred by state law because Conahan raised
them in his Rule 3.851 motion.   Id. at 735.   The court rejected
the others as procedurally barred because they were not preserved
at trial, and found them meritless:

> Because the remaining claims were not properly preserved
> at trial by objection, appellate counsel cannot be
> deficient for failing to raise these claims on appeal
> unless the claims constitute fundamental error.   See
> Valle, 837 So.2d at 909. As previously explained, in
> order to be a fundamental error, " 'the error must reach
> down into the validity of the trial itself to the extent

that a verdict of guilty could not have been obtained
without the assistance of the alleged error.'" Jaimes,
51 So.3d at 448 (quoting Delva, 575 So.2d at 644-45).

Conahan first claims that the State committed
prosecutorial misconduct by filing a nolle prosequi in
the Burden case in order to gain a tactical advantage.
However, Conahan provides no support for this assertion.
Furthermore, there was no improper delay because as the
circuit court found the State never re-filed charges in
the Burden case. Thus, this claim is without merit.

Next, Conahan claims that the State misrepresented the
testimony of Newman in the arguments opposing Conahan's
motion for judgment of acquittal. However, this claim is
refuted by the record. Specifically, the prosecutor
argued that Newman had testified that Conahan initially
denied knowing Montgomery, but then admitted he did know
Montgomery and characterized Montgomery as a mistake.
This is indeed the testimony that Newman provided at
trial. Thus, the prosecution presented an accurate
summary of Newman's testimony, and there was no
misconduct.

Additionally, Conahan claims that the State
misrepresented the testimony of Mrs. Montgomery in
arguments opposing Conahan's motion for judgment of
acquittal. However, this claim is also refuted by the
record. Specifically, the prosecutor argued that Mrs.
Montgomery had testified that her son told her that he
had met a man named Conahan who was a nurse and had been
in the Navy and that someone had offered her son $200 to
pose in nude photographs. This is an accurate summary of
Mrs. Montgomery's trial testimony. Therefore, this
argument was not improper.

Next, Conahan claims that the State made improper
arguments while opposing his motion for judgment of
acquittal by implying that the reason the victim's
genitals had been removed was to eliminate DNA evidence
and that the genitals had been removed by a sharp knife,
the same kind that Conahan had purchased that day.
However, Conahan is not entitled to relief. The alleged
improper statements were made as part of the
prosecutor's specific argument opposing the judgment of
acquittal on the sexual battery charge, but the trial
court granted Conahan's motion for judgment of acquittal

on the sexual battery charge. Therefore, even if these arguments were misleading or improper, the error was not fundamental, and appellate counsel cannot be held deficient for failing to raise a meritless issue. Schoenwetter v. State, 46 So.3d 535, 563 (Fla.2010) (citing Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000)).

Finally, Conahan claims that the State made improper comments during the closing arguments of the guilt phase by (1) implying that Hal Linde held back in his testimony as to the full extent of Conahan's fantasy; (2) by arguing that Conahan admitted to having a dark, sexual fantasy; and (3) by arguing in conflict with the medical examiner's testimony that Conahan used a razor sharp knife to remove the genitals of Montgomery and stating there was some foreign material left behind in the genital area. Again, Conahan is not entitled to relief.

During closing arguments in the guilt phase, the prosecutor argued that Hal Linde, Conahan's former lover, had testified to Conahan's bondage fantasy that involved "picking up hitchhikers, taking them out in the woods, tying them up and having sex with them." He then stated that it was obvious that Mr. Linde still cared for Conahan and that Mr. Linde held back the ultimate culmination of the fantasy, which was to murder the men after tying them up and having sex with them. These comments were not improper misrepresentations as the record shows that Mr. Linde did in fact testify about Conahan's sexual bondage fantasy and did admit on the record that he was still in love with Conahan. Implying that the culmination of the fantasy was murder was reasonable given other evidence in the case. Conahan had seemingly acted out this same fantasy with Burden, and, as Burden testified at trial, Conahan attempted to kill Burden by trying to strangle him. Additionally, the record supports the prosecutor's statement that Conahan admitted during his testimony to having a sexual bondage fantasy that included tying individuals up in the woods.

Furthermore, the medical examiner testified at trial that the genitals had been removed "very precisely with a sharp knife, ... or a scalpel blade, very sharp" and that upon examination of the area "some foreign material was there." Therefore, the prosecutor's comments that Conahan removed the victim's genitals with a razor sharp

knife and that there was foreign material left behind was an accurate summary of all of the testimony and evidence that had been presented.

Accordingly, because appellate counsel cannot be deemed deficient for failing to raise meritless or procedurally barred issues, we deny relief.

Id. at 735-37.

Conahan argues the Florida Supreme Court was wrong when it held there was no fundamental error. That argument fails because "the fundamental error question is an issue of state law, and state law is what the state courts say it is." Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1299 (11th Cir. 2017) ("As the Supreme Court and this Court have repeatedly acknowledged, it is not a federal court's role to examine the propriety of a state court's determination of state law.").

Conahan also attempts to excuse his failure to raise the Burden issue on direct appeal because the appellate record was incomplete. (Doc. #27 at 22-25). But he does not identify any particular documents that were omitted from the record, nor does he explain how any such omission caused his default. This conclusory, unsupported claim of an incomplete record does not overcome the procedural default.

Each claim in Ground 4 is denied.

**e. Ground 5: Trial counsel was ineffective in the sentencing phase**

Attorney Paul Sullivan led the defense team in the sentencing phase of Conahan's trial. Conahan argues Sullivan failed to investigate and present certain mitigation evidence and failed to adequately question prospective jurors.

### i. Mitigation evidence

Conahan claims Sullivan failed to adequately prepare and present a mitigation case during the sentencing phase. Conahan raised this ground in his Rule 3.851 motion. After an evidentiary hearing, the postconviction court found no deficiency or prejudice and denied both claims. The Florida Supreme Court affirmed:

> Conahan claims that trial counsel was ineffective for failing to adequately investigate and present mitigation evidence in the penalty phase. Specifically, he claims trial counsel was ineffective for failing to present the mental health and competency evaluations of Doctor Gunder and Doctor Keown, failing to have a neuropsychologist evaluate him, and failing to present the testimony of the mitigation specialists, the investigator, and his sister. We affirm the circuit court's denial of relief.
>
> As explained earlier, this Court has described the two prongs of Strickland as follows:
>
>> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Bolin, 41 So.3d at 155 (quoting Maxwell, 490 So.2d at 932).

Regarding the second prong,

> [the defendant] must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence. To assess that probability, we consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [postconviction] proceeding"—and "reweigh it against the evidence in aggravation."

Porter v. McCollum, 558 U.S. 30, 130 S. Ct. 447, 453–54, 175 L. Ed.2d 398 (2009) (quoting Williams v. Taylor, 529 U.S. 362, 397–98, 120 S. Ct. 1495, 146 L. Ed.2d 389 (2000)). "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.'" Henry, 948 So. 2d at 617 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).

Here, Conahan has failed to demonstrate that trial counsel's performance resulted in prejudice. At the evidentiary hearing, Conahan did not present any additional statutory or non-statutory mitigation evidence, experts, or witnesses that would have been available at trial and that trial counsel failed to present. Additionally, Conahan did not present his sister's testimony at the evidentiary hearing, so it is unknown how it could possibly have aided him.

Thus, Conahan has not demonstrated prejudice because "the mitigating evidence adduced at the evidentiary hearing combined with the mitigation evidence presented at the penalty phase would not outweigh the evidence in aggravation." Tanzi v. State, 94 So.3d 482, 491 (Fla. 2012); see also Porter, 130 S.Ct. at 453–54. In other words, Conahan did not demonstrate that calling any of these individuals as witnesses would have resulted in mitigation that would "undermine this Court's confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court." Hurst v. State, 18 So.3d 975, 1013 (Fla. 2009). Accordingly, we affirm the circuit court's denial of relief.

Conahan, 118 So. 3d at 730.

Conahan attacks the postconviction court's determination that Sullivan's performance was not deficient, but he does not meaningfully challenge the Florida Supreme Court's finding that he failed to establish prejudice.  And indeed, the record supports the state court's determination that Conahan failed to identify any mitigation evidence that Sullivan unreasonably failed to present.

In his habeas petition, Conahan points to the following omissions by Sullivan: he did not arrange a neuropsychological evaluation of Conahan or present any expert mental health testimony; he did not present testimony from Shawn Luedke (Conahan's sister) or investigator Laura Blankman; and he did not introduce the mental health and competency evaluations that indicated Conahan was neither mentally ill nor a sexual sadist.

Conahan failed to prove that any of these omissions prejudiced him.  The mental health and competency evaluations did not include any mitigating findings, and even now, Conahan does not identify any mitigation theory those reports could have supported.  Conahan also failed to produce any evidence that a neuropsychological evaluation or other mental health testimony would have been mitigating.  He did not present any such testimony at the postconviction hearing.  Sullivan did not call Shawn Luedke

because she did not want to testify, and Conahan did not want to involve her. (Doc. #89-6 at 533). Luedke did not testify at the evidentiary hearing, so Conahan can only speculate about what she might have said. Sullivan testified he did not call Blankman because he did not think she could give any non-duplicative testimony. (Id. at 432). At the postconviction hearing, Blankman recounted the investigative work she did for the case, but she did not describe any mitigation testimony she could have contributed at sentencing. Nor did she testify she was available to testify— she had not attended either phase of the trial. (Id. at 915-57).

The record supports the Florida Supreme Court's finding that Conahan failed to prove the existence of any available mitigating evidence that Sullivan failed to present. Because Conahan failed to show prejudice, the Florida Supreme Court correctly applied Strickland by denying this sub-ground.

### ii. Jury selection

Conahan also argues Sullivan should have questioned the jury venire about their feelings or opinions concerning mitigation, homosexuality, sexual fantasies, bondage, or drug use. The postconviction court found that Conahan failed to establish either prong of Strickland. On appeal, Conahan only argued the homosexuality issue, so the other issues are unexhausted and procedurally barred. The Florida Supreme Court found that Conahan failed to prove this claim:

Specifically, Conahan has failed to establish prejudice under <u>Strickland</u>. This Court has previously held that a defendant must demonstrate that an unqualified or biased juror actually served on his jury in order to demonstrate prejudice in a postconviction ineffective assistance of counsel claim. <u>See Davis v. State</u>, 928 So. 2d 1089, 1117 (Fla. 2005). Conahan has not presented any evidence that a juror who was biased because of his or her personal views regarding homosexuality actually served on his jury. Therefore, there is not a reasonable probability of a different sentence, and our confidence in the outcome is not undermined.

<u>Conahan</u>, 118 So. 3d at 731.

The Florida Supreme Court correctly applied <u>Strickland</u> here. Conahan presented no evidence that any juror was biased against homosexuality. In his appeal brief, Conahan asked the court to presume prejudice "because when it comes to homosexuality in modern society, few issues are as polarizing and cause such heated rhetoric." (Doc. #89-6 at 1120). The court correctly rejected that presumption. <u>See Fennell v. Sec'y, Fla. Dep't of Corr.</u>, 582 F. App'x 828, 834 (11th Cir. 2014) (rejecting a jury-selection <u>Strickland</u> claim because the petitioner "did not show that [the juror] was actually biased against him").

Conahan presents a new factual basis in his federal habeas petition. During the sentencing phase, the bailiff found newspaper articles about two unrelated murders in the jury room. One described a murder case in Wyoming, in which the prosecution emphasized homosexual relations as a motivation for the killing. Conahan did not develop this argument in state court, so it is

unexhausted.  See McNair v. Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005) ("While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." (internal quotation marks and citations omitted)).  And even if Conahan had properly exhausted this specific factual foundation in state court, this sub-ground would still be too speculative to prove prejudice under Strickland.

Ground 5 is denied.

### f. Ground 6: Admission of Williams rule evidence was fundamental error

Conahan argues the trial court misapplied Florida law when it admitted evidence of certain extrinsic acts under the Williams rule, including the aborted attack on Burden and the solicitations of Detectives Weir and Clemens.  Conahan did not raise this claim on direct appeal.  But the state court had an opportunity to consider the issue when Conahan argued in his state habeas petition that his appellate counsel was ineffective for failing to raise the claim on direct appeal.  The Florida Supreme Court found the trial court properly admitted the evidence under Florida law:

> In this case, the admission of the Williams rule evidence was not error, let alone fundamental error.  First, the Williams rule evidence was established by clear and convincing evidence.  Mr. Burden gave unrebutted testimony at trial detailing his encounter with Conahan and the assault.  Furthermore, the undercover detectives

testified at trial regarding their interactions with Conahan and how Conahan had solicited them to pose in nude bondage photographs. Additionally, there were recordings of some of these operations that confirmed the detectives' testimony.

Second, the evidence was sufficiently similar and properly admitted because as the trial court found, there were various points of similarity that were relevant to prove a common scheme or plan and an unusual modus operandi. We have previously held that the collateral crime does not have to be identical to the crime charged in order to be admitted as Williams rule evidence. See Gore v. State, 599 So.2d 978, 984 (Fla. 1992) (noting that the collateral crime does not have to be identical to the crime charged and finding that the collateral crime in Gore was properly admitted and the dissimilarities seemed to be the result of differences in opportunity rather than differences in modus operandi); see also Durousseau v. State, 55 So.3d 543, 551-52 (Fla. 2010) (holding that evidence that the defendant committed substantially similar crimes on other occasions was properly admitted as Williams rule evidence because it was relevant to material issues such as identify and premeditation), cert. denied, --- U.S. ---, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011).

Specifically, the trial court found multiple similarities between the victims, Burden and Montgomery, namely age, race, height, weight, and complexion. There were similarities between the crime scenes, including that they were both remote, secluded, wooded areas, accessible only by feet, and the victims were tied to a tree. In addition, the crimes were conducted in a similar manner. Clothesline-like rope was used, placement of rope and the strangulation caused grooved abrasions on the neck in the same area, both victims were naked, ropes were placed tightly on the wrists of the victims, the victims were offered money to pose in nude photos, and Conahan had purchased cutting pliers near the time of each crime.

Furthermore, although the Williams rule evidence was helpful in establishing a common scheme or plan and a unique modus operandi, it did not become a feature of the trial. The State produced other evidence that established Conahan's guilt, including testimony from

other witnesses that the victim and Conahan knew each
other, testimony from the victim's friends that
Montgomery stated he was going to do something to make
$200 on the night he was killed, evidence that Conahan
withdrew a similar amount of cash from an ATM that
evening, and a Walmart receipt showing that on the
evening Conahan bought a rope identical to the one that
the victim was tied up with, as well as a pair of pliers,
polaroid film, and a knife.  There was also testimony
from the victim's mother that her son had told her he
had met a man named Conahan and that someone had offered
him money to pose in nude photographs.  Conahan's former
lover testified that Conahan had a bondage fantasy, and
Conahan himself admitted that he had a bondage fantasy.
Moreover, there was other forensic evidence.

Accordingly, the <u>Williams</u> rule evidence was properly
admitted and did not become an improper feature of the
trial.  Because it was properly admitted, there was no
fundamental error.  And appellate counsel cannot be
deemed deficient for failing to raise this meritless
issue.

<u>Conahan</u>, 118 So. 3d at 733-34.

Conahan's claim that the Florida courts misapplied Florida

law—namely, the <u>Williams</u> rule and the fundamental error doctrine—

is not cognizable in a federal habeas case.  "[I]t is only

noncompliance with *federal* law that renders a State's criminal

judgment susceptible to collateral attack in federal courts."

<u>Wilson</u>, 562 U.S. at 5; <u>see also</u> <u>Estelle v. McGuire</u>, 502 U.S. 62,

63 (1991) ("It was also improper for the Court of Appeals to base

its holding on its conclusion that the evidence was incorrectly

admitted under state law, since it is not the province of a federal

habeas court to reexamine state-court determinations on state-law

questions.").

Conahan asserts that admission of the Williams rule evidence violated his due process rights.  While a federal habeas case generally will not review a state court's decisions on the admissibility of evidence, "where a state court's ruling is claimed to have deprived a defendant of his right to due process, a federal court should then inquire only to determine whether the error was of such magnitude as to deny fundamental fairness to the criminal trial." Tidwell v. Butler, 415 F. App'x 979, 980 (11th Cir. 2011) (citation omitted).  Conahan has not shown the Williams rule evidence denied him a fundamentally fair trial.  As the Florida Supreme Court explained, the Williams rule evidence was relevant to establish a scheme and modus operandi similar to the murder of Montgomery.  See id. at 980 n.2.  Though Conahan claimed the Williams rule evidence violated "clearly applicable United States Supreme Court precedent[,]" he did not identify a single relevant Supreme Court case.  Ground 6 is denied.

### g. Ground 7: Defective search warrants

Conahan claims, "If the search warrants were unconstitutional, a number of items and objects were illegally seized by the police" because "many items listed as objects of the search in the affidavit were described with no more particularity than were in the search warrants."  (Doc. #26 at 88).  Conahan made a similar argument as part of an ineffective-assistance-of-

appellate-counsel claim in his state habeas petition.   The Florida

Supreme Court rejected it:

> Conahan also claims that appellate counsel was
> ineffective for failing to argue on direct appeal that
> there was a flawed search. However, Conahan is not
> entitled to habeas relief because this claim is facially
> insufficient. A habeas petition must plead specific
> facts that entitle the defendant to relief. Conclusory
> allegations have repeatedly been held insufficient by
> this Court because they do not permit the court to
> examine the specific allegations against the record.
> Bradley v. State, 33 So.3d 664, 685 (Fla. 2010) (citing
> Doorbal v. State, 983 So.2d 464, 482 (Fla. 2008)); Patton
> v. State, 878 So.2d 368, 380 (Fla. 2004) (citing Ragsdale
> v. State, 720 So.2d 203, 207 (Fla. 1998) (finding that
> conclusory allegations are also not sufficient for
> appellate purposes in habeas proceedings)). Because
> Conahan fails to plead specific facts as to how the
> search warrants and supporting affidavits were
> deficient, his claim is merely conclusory and
> speculative. Therefore, he is not entitled to relief.

Conahan, 118 So. 3d at 734.

This ground fails for the same reason—it is facially

insufficient.   Conahan merely speculates—without any supporting

facts—that some search warrants might have been unconstitutional.

He does not allege any specific deficiencies in the warrants or

affidavits.   And because Conahan failed to develop any factual

basis for this claim in state court, the warrants and affidavits

are not in the record, and Conahan may not introduce them now.

See 28 U.S.C. § 2254(e)(2); see also Shinn v. Ramirez, 142 S. Ct.

1718, 1728 (2022).   Conahan also fails to allege a violation of

any federal law.   Ground 7 is denied.

### h. **Ground 8: The State failed to disclose promises of assistance made to Burden in return for his testimony**

In a 2018 supplement to his federal habeas petition, Conahan raised a new <u>Brady</u>/<u>Giglio</u> claim.  At the time of Conahan's trial, Burden was in the early years of a maximum 25-year prison sentence in Ohio.  Conahan's counsel received a letter Burden wrote to a man named Ken Karnig that claimed prosecutor Lee told Burden he would help with the Ohio parole board.  Burden repeated that claim in interviews and an affidavit.  (Doc. #57-1).  A handwritten line at the bottom of the affidavit claims Lee told Burden not to disclose the promise.  (<u>Id.</u> at 15).  Burden testified at trial that no one offered him anything in exchange for testifying.  (Doc. #89-3 at 873).

Conahan raised this claim in state court in a successive Rule 3.851 motion.  The state postconviction court summarily rejected it.  The Florida Supreme Court affirmed because Conahan failed to satisfy Florida's standard for a new trial based on newly discovered evidence, and because the new evidence was not material under the <u>Giglio</u> and <u>Brady</u> standards:

> To obtain a new trial based on newly discovered evidence, the second prong requires that "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." <u>Johnston</u> v. State 27, So.3d 11, 18 (Fla. 2010) (quoting <u>Jones v. State</u>, 709 SO. 2d 512, 521 (Fla. 1998)).  "If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence." <u>Id.</u> at 18-19 (quoting <u>Marek v. State</u>, 14 So. 3d 985, 990 (Fla. 2009)).

Evidence is material under Giglio "if there is any
reasonable possibility that it could have affected the
verdict, and the State bears the burden of proving the
false testimony was not material by demonstrating it was
harmless beyond a reasonable doubt." Rivera v. State,
187 So. 3d 822, 835 (Fla. 2015). Under Brady, "[t]o
establish the materiality prong, a defendant must
demonstrate a reasonable probability that, had the
evidence been disclosed to the defense, the result of
the proceeding would have been different. In other
words, evidence is material under Brady only if it
undermines confidence in the verdict." Id. at 838
(citation omitted).

Here, in Burden's November 2015 affidavit, Burden
explained that he would not have testified voluntarily
but for a promise from the prosecutor to write a letter
to the parole board on Burden's behalf. Burden did not
recant his testimony that Conahan tied him to a tree and
attempted to sodomize and strangle him. Moreover, there
was physical evidence corroborating Burden's testimony,
including scars around Burden's neck and indentations
around the tree from the rope that Conahan used to
restrain and to attempt to strangle Burden.
Additionally, the trier-of-fact was already aware from
Burden's testimony that Burden hoped that by testifying
he would get documentation illustrating his cooperation
that he could contribute to his court file and prison
record and that he planned to inform the parole board
about his cooperation in the Montgomery case.

Accordingly, we affirm the denial of Conahan's first
claim because the alleged newly discovered evidence
would not probably produce an acquittal or a less severe
sentence, there is not a reasonable possibility that it
could have affected the result, and our confidence in
the outcome is not undermined. See Kormondy v. State,
154 So. 3d 341, 352-53 (Fla. 2015); State v. Woodel, 145
So. 3d 782, 806-07 (Fla. 2014); Ponticelli v. State, 941
So. 2d 1073, 1085-86, 1088-89 (Fla. 2006).

Conahan, 2017 WL 656306 at *1.

The Florida Supreme Court reasonably applied the federal

standard for Giglio/Brady claims.  It correctly recognized that

the State must prove the materiality prong beyond a reasonable doubt, and its determination that the State carried its burden was reasonable.   Burden did not claim Lee's promise influenced the substance of his testimony.   Rather, his affidavit states, "If Prosecutor Lee had not promised that he would write the letter to the Parole Board, I would have come back to Ohio without testifying or cooperating."[7]   (Doc. #57-1 at 14).   If the affidavit left any uncertainty about when Lee allegedly made the promise, Burden's letter to Karnig cleared it up.   He wrote, "After we land [sic] we drove to Desoto County Jail where I stayed during the trial. I ask Mr. Lee if he would give me a little help with the parole board and he tells me he'll go to bat for me!"   (Id. at 3).   The timing eliminates any implication that Burden concocted a story about Conahan because of the alleged promise.   Burden identified Conahan as his attacker and described the attack multiple times years earlier—the record contains a detailed account of the attack Burden gave in a deposition about two years before trial.   (Doc. #89-7 at 150-203).   Burden has not recanted any of that testimony.

The newly discovered evidence is relevant to Burden's credibility.   But it would not have made a significant impact on the trial judge—the guilt-phase factfinder in this case—who already questioned Burden's credibility.   (Doc. #89-3 at 1583 ("I

---

[7] The postconviction court noted that Burden was subject to a subpoena.   (Doc. #89-6).

would agree with the Defendant's argument that had Burden simply testified his testimony might be subject to some questionable credibility")).  The court credited Burden's testimony about the attack because it was corroborated by physical evidence, including scars on Burden's neck and pictures police took during their investigation.  (Id.)  Thus, the newly discovered evidence did not undermine Burden's inculpatory testimony, nor would it have impacted the admissibility of Burden's testimony under the Williams rule.

There is no reasonable probability that evidence of Lee's alleged secret promise to write the Ohio parole board a letter on Burden's behalf would change the outcome of the proceedings. Ground 8 is denied.

### i. Ground 9: The Florida Supreme Court misapplied Hurst v. Florida

In Hurst v. Florida, 577 U.S. 92 (2016), the Supreme Court held that Florida's capital sentencing scheme violated the Sixth Amendment.  The Hurst Court summarized the pre-Hurst sentencing procedure Florida courts used after a defendant was convicted of a capital crime:

> The additional sentencing proceeding Florida employs is a "hybrid" proceeding in which a jury renders an advisory verdict but the judge makes the ultimate sentencing determinations.  First, the sentencing judge conducts an evidentiary hearing before a jury.  Next, the jury renders an advisory sentence of life or death without specifying the factual basis of its recommendation. Notwithstanding the recommendation of a majority of the

jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death.  If the court imposes death, it must set forth in writing its findings upon which the sentence of death is based.  Although the judge must give the jury recommendation great weight, the sentencing order must reflect the trial judge's independent judgment about the existence of aggravating and mitigating factors.

Hurst v. Florida, 577 U.S. 92 at 95-96 (2016) (internal quotation marks and citations omitted).  This procedure was in effect when Conahan was sentenced.  The Supreme Court found it unconstitutional because it requires a judge—not a jury—to make the critical factual findings necessary to impose the death penalty.  Id. at 98.  The Court declined to address the State's assertion that any error was harmless and remanded the case.  Id. at 102-03.

On remand, the Florida Supreme Court went a step further. Along with the existence of aggravating circumstances, it held that a "jury must also unanimously find that the aggravating factors are *sufficient* for the imposition of death and unanimously find that the aggravating factors *outweigh* the mitigation before a sentence of death may be considered by the judge."  Hurst v. State, 202 So. 3d 40, 54 (Fla. 2016).  The court based its heightened protection in part on Florida law and in part on its understanding that "Hurst v. Florida mandates that all the findings necessary for imposition of a death sentence are 'elements' that must be found by a jury[.]"  Id. at 57.

The Florida legislature codified Hurst v. State's heightened standard in 2017.   Under Florida Statute § 921.141, a court may only impose the death penalty if a jury unanimously (1) finds at least one aggravating factor and (2) determines the defendant should be sentenced to death.   The Florida Supreme Court has since recognized that it "erred in Hurst v. State when [it] held that the Eighth Amendment requires a unanimous jury recommendation of death."   State v. Poole, 297 So. 3d 487, 504 (Fla. 2020) (citing Spaziano v. Florida, 468 U.S. 447 (1984)).   The court receded from Hurst v. State "except to the extent that it held that a jury must unanimously find the existence of a statutory aggravating circumstance beyond a reasonable doubt."   Id. at 491.

Conahan argued in a successive Rule 3.851 motion that his sentence must be vacated in light of Hurst, Caldwell v. Mississippi,[8] and the amended Florida Statute § 921.141.   The Florida Supreme Court agreed that Hurst retroactively applies to Conahan's case, but denied relief:

> [B]ecause we find that the Hurst error in this case is harmless beyond a reasonable doubt, we affirm the denial of Hurst relief.   See Davis v. State, 207 So. 3d 142, 175 (Fla. 2016) ("The unanimous recommendations here are precisely what we determined in Hurst to be constitutionally necessary to impose a sentence of death."), cert. denied, --- U.S. ----, 137 S.Ct. 2218, 198 L.Ed.2d 663 (2017).   We also reject Conahan's Hurst-induced Caldwell claim.   See Reynolds v. State, 251 So. 3d 811, 824-25 (Fla. 2018) petition for cert. filed, No. 18-5181 (U.S. July 3, 2018).   Finally, we reject

---

[8] Caldwell v. Mississippi, 472 U.S. 320 (1985)

> Conahan's contention that he is entitled to application of chapter 2017-1, Laws of Florida. See Taylor v. State, 246 So. 3d 231, 240 (Fla. 2018) ("[W]e rejected as without merit the claim that chapter 2017-1, Laws of Florida, created a substantive right that must be retroactively applied.").

Conahan v. State, 258 So. 3d 1237, 1238 (Fla. 2018).  In a supplement to his federal habeas petition, Conahan challenges the state court's rejection of his three Hurst-related claims.

### i. Harmless error

Conahan argues the Florida Supreme Court did not conduct a proper harmless-error review, but rather applies a per se rule of denying Hurst claims when a jury unanimously recommended the death penalty.  The Florida Supreme Court explained in a different case how it determines when a Hurst error is harmless:

> Preliminarily, we look to whether the jury recommendation was unanimous…Yet a unanimous recommendation is not sufficient alone; rather, it begins a foundation for us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors.  Hence, we look to other factors such as the jury instructions…Next, we review the aggravators and mitigators…[W]e have stated that it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravating factors that outweighed the mitigating circumstances…Finally, we look at the facts of the case.

Reynolds v. State, 251 So. 3d 811, 815-18 (Fla. 2018) (cleaned up).

Conahan fails to show that the Florida Supreme Court's harmless-error analysis was contrary to any federal law.  First,

the Supreme Court's Hurst opinion suggests harmless error is an issue for state courts to decide.  The Florida Supreme Court's method of review shows why.  It is built around Florida law, which is more protective than federal law.  As explained above, the Constitution permits a Florida court to impose the death penalty only if a jury unanimously finds the existence of an aggravating factor.  Florida law also requires the jury to unanimously recommend death after considering mitigating factors.

The jury in this case unanimously recommended the death sentence.  Under both federal and Florida law, a jury is presumed to follow the trial court's instructions.  United States v. Perry, 14 F.4th 1253, 1276 (11th Cir. 2021); Carter v. Brown & Williamson Tobacco Corp., 778 So.2d 932, 942 (Fla. 2000).  Reviewing courts can draw inferences about a jury's findings from the jury instructions.  The trial court in Conahan's case gave the following instruction:

> [I]t is your duty to follow the law that will now be given to you by the Court and render to the Court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist…If you find the aggravating circumstances do not justify the death penalty, your advisory sentence should be one of life imprisonment without parole.  Should you find sufficient aggravating circumstances do exist it will then be your duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances.

(Doc. #89-4 at 483-86).  Conahan's jury could not have recommended the death penalty without first finding at least one aggravating factor.  That is what the Constitution requires.  Conahan argues there is a reasonable probability that at least one juror might have weighed the aggravating and mitigating factors differently absent the Hurst error, but that argument arises from state law protections and is not reviewable here.

### ii. Caldwell

Conahan's next claim is based on Caldwell and Hurst.  He argues the pre-Hurst jury instructions violated Caldwell because they did not inform the jury that a death recommendation must be unanimous.  The Supreme Court explained the reach of Caldwell in Romero v. Oklahoma:

> [W]e have since read Caldwell as relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.  Thus, to establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.

512 U.S. 1, 9 (1994) (cleaned up).

Conahan fails to identify any part of the trial court's instructions that mischaracterized the jury's role in sentencing. Nor did he identify any comment from the trial court or prosecutor that invited the jury to feel less responsible than it should. Conahan presents no precedent suggesting that Florida's pre-Hurst

jury instructions violated Caldwell. Conahan instead relies on Justice Breyer's explanatory statement and Justice Sotomayor's dissent in the Supreme Court's denial of certiorari in Reynolds v. Florida, 139 S. Ct. 27 (2018), both of which are based on reasoning not adopted by a majority of justices. This Court cannot grant habeas relief based on dissenting opinions. See Purcell v. BankAtlantic Fin. Corp., 85 F.3d 1508, 1513 (11th Cir. 1996) ("a dissenting Supreme Court opinion is not binding precedent").

For these reasons, Conahan's Caldwell claim lacks merit. See Davis v. Singletary, 119 F.3d 1471, 1482 (11th Cir. 1997) ("[I]t is clear that references to and descriptions of the jury's sentencing verdict as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under Caldwell…because they accurately characterize the jury's and judge's sentencing roles under Florida law.").

### iii. Revised sentencing statute

Finally, Conahan argues the Florida Supreme Court should have retroactively applied the 2017 amendments to Florida's capital sentencing scheme to Conahan's case. The changes to Florida law prompted by Hurst and codified in Florida Statute § 921.141 are procedural, not substantive. Knight v. Fla. Dep't of Corr., 936 F.3d 1322, 1336-67 (11th Cir. 2019). And the Supreme Court has held, "New rules of procedure…generally do not apply retroactively." Schriro v. Summerlin, 542 U.S. 348, 352 (2004).

The Court recognized exceptions for "a small set of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." Id. (internal quotations marks and citations omitted).  The amendment of Florida Statute 921.141 does not meet that stringent standard, so federal law does not require its retroactive application.  See id. (declining to require retroactive application of Ring v. Arizona, 536 U.S. 584 (2002), which established the right to a jury determination of aggravating circumstances in capital cases).

## IV. Certificate of Appealability

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a certificate of appealability (COA).  "A [COA] may issue…only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing, a petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were adequate to deserve encouragement to proceed further," Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (citations omitted). Conahan has not made the requisite

showing here and may not have a certificate of appealability on any ground of his original or supplemental petitions.

Accordingly, it is hereby

**ORDERED**:

(1) Daniel O. Conahan's Amended Petition for Writ of Habeas Corpus (Doc. #26) and two supplements (Docs. #56 and #62) are **DENIED.**

(2) Conahan is not entitled to a certificate of appealability.

(3) The Clerk is **DIRECTED** to terminate any pending motions and deadlines, enter judgment, and close this case.

**DONE and ORDERED** at Fort Myers, Florida, this ___27th___ day of March 2023.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record